UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**LEXINGTON**

EDWARD L. ABNEY, BARBARA ALLEN, )
JAMES DAY, ROBERT GREEN,          )
DELBERT JACKSON, JAMES PUGH,      )
ROGER THACKER, and DANIEL         ) Civil Action No. 5:05-CV-254-JMH
HUNTER WEBSTER,                   )
                                  )
      Plaintiffs,                 )
                                  ) **MEMORANDUM OPINION AND ORDER**
v.                                )
                                  )
AMGEN, INC.,                      )
                                  )
      Defendant.                  )
                                  )

**        **        **        **        **

This matter is before the Court on Plaintiffs' motion for a preliminary injunction [Record No. 2]. Having reviewed the motion, response, and reply, and having heard oral argument on the matter on July 5, 2005, the Court finds that a preliminary injunction is not warranted.

## I. Factual and Procedural Background

Parkinson's disease is a progressive neurodegenerative disorder characterized by the loss of cells that produce dopamine in the brain, resulting in tremors, shaking, slow movement, muscle stiffness, and rigidity. Currently, there is no cure for Parkinson's; the existing drugs only mask the symptoms by replacing dopamine, but fail to stop the death of the brain cells that produce dopamine.

Synergyn, a biotechnology company, designed a synthetic protein called glial cell line-derived neurotropic factor ("GDNF"),

a naturally occurring protein found in the body, that hoped to spur the growth of dopamine producing cells, possibly changing the course of the Parkinson's disease, not just masking the symptoms. The defendant, Amgen, Inc. ("Amgen"), bought Synergyn in 1994. Both Synergyn and Amgen encountered trouble finding a mechanism for delivery of GDNF because the drug had to be delivered directly to the brain in order to be effective.

Steven S. Gill ("Dr. Gill") of Frenchay Hospital in England subsequently discovered a way to administer GDNF directly to the brain with a procedure called bilateral intraputaminal ("IPu") administration. The procedure involves implanting a pump filled with GDNF in the patient's abdomen that is attached to catheters that are threaded through the chest, neck, and head. Through an incision in the skull, the catheters deliver GDNF directly to the putamen.

In 2000, Amgen supported an open-label,[1] Phase I[2] study in the United Kingdom using five patients that had advanced Parkinson's disease ("Bristol Study"). The Bristol Study was initiated by Dr.

_____

[1] In open-label trials, the study participants know that they are receiving the study drug and there are no participants taking a placebo.

[2] There are usually three phases for clinical trials. In Phase I, the safety of the drug is assessed on a small number of patients or healthy volunteers. Phase II involves administration of the drug to unhealthy patients to review safety and efficacy. Phase III trials are large-scale studies that assess long-term safety and efficacy of the drug for its intended use. 21 C.F.R. § 312.21.

Gill and received favorable results, but because the study was open-label, Amgen believed that more research was needed. In 2001 Amgen supported the second Phase I trial using IPu administration that took place at the University of Kentucky Medical Center ("Kentucky study"). Drs. John T. Slevin ("Dr. Slevin") and Byron Young ("Dr. Young"), principal investigators of the Kentucky study, initiated and designed the study, drafted the protocol, and administered the drug to ten patients with all patients showing benefits at ten months. Amgen supported the Kentucky study but did not become a sponsor until September of 2002. Amgen asserts that the results of both Phase I trials were not significant because they were open-label, were not randomized, and did not include a placebo control group.

The Phase II trial ("the '168 Study") began in 2003 and involved thirty-four patients at eight sites.[3] This trial was a double-blind, multi-center, placebo-controlled, parallel-group trial that tested safety and efficacy and used the same IPu method of administration used in the Bristol and Kentucky studies. Using the Unified Parkinson's Disease Rating Scale, Amgen hoped to see a 25% increase in motor scores relative to the placebo after six

---

[3] The eight selected sites included: New York University; the University of Chicago; the Frenchay Hospital in Bristol, England; the University of Virginia; Duke University; Oregon Health Sciences University; Toronto Western Hospital; and the University of Minnesota (no patients were enrolled at the Minnesota site). (Def.'s Mem. in Opp'n, Ex. 8, Decl. Of Masterman at ¶ 16.)

months of treatment.  In June of 2004, the results of the '168 study showed only a 10.01% increase in the group using GDNF and a 4.52% increase in the group using the placebo.  Seven of the thirty-four subjects demonstrated dramatic improvement, but four of the seven were receiving placebos.

Even though Amgen was not pleased with the efficacy results of the '168 study, the study continued and converted into an open-label study with all thirty-four patients receiving GDNF ("the '160 study").  During this time, the patients in the Kentucky study continued to receive GDNF in varying doses, up to 30 µg/day.  Also during this time, Amgen considered increasing the doses of the patients in the '160 study to 60 µgs/day.  Amgen discussed the efficacy findings and possible modifications to the program with advocacy organizations in August of 2004.

The plaintiffs, Edward L. Abney ("Mr. Abney"), Barbara Allen ("Ms. Allen"), James Day ("Mr. Day"), Robert Green ("Mr. Green"), Delbert Jackson ("Mr. Jackson"), James Pugh ("Mr. Pugh"), Roger Thacker ("Mr. Thacker"), and Daniel Hunter Webster ("Mr. Webster") (collectively, the "Kentucky patients" or "the plaintiffs"), all suffer from Parkinson's disease and are eight of the ten patients who participated in the Kentucky study.

The plaintiffs contend that after GDNF was administered, they experienced marked physical, cognitive, and emotional improvement. The plaintiffs also submitted affidavits from patients of the '168

4

study that attest to similar improvements, including affidavits
from several of the patients from the New York, Frenchay, and
University of Chicago locations.   Additionally, the plaintiffs
submitted affidavits from all of the doctors participating in
Kentucky study and principal investigators involved in the New York
and Chicago studies that unanimously state that GDNF is safe and
benefits Parkinson's patients.

Prior to the surgery to insert the pump and pursuant to 45
C.F.R. § 46.101, otherwise known as the Common Rule, the plaintiffs
each signed the Informed Consent Document ("KY Informed Consent").
(Pl.'s Compl., Ex. E.)  The KY Informed Consent provides that Amgen
was the sponsor of the study; that the people in charge of the
study were Drs. Slevin and Young; and that "the individuals
conducting the study may need to withdraw" the patients from the
study if "they find that your being in the study is more risk than
benefit to you, if you are not able to follow the directions they
give you, or if the agency funding the study decides to stop the
study early for a variety of scientific reasons."  (*Id*. at 1 &
15.)  The KY Informed Consent also states, "Starting at week 28 you
may elect to continue treatment for up to an additional 24 months.
If you elect to continue treatment the procedures listed for week
33 will be done approximately 1 month after the conclusion of the
extended treatment period."  (*Id*. at 2.)

Alleging scientific reasons, in September 2004, Amgen

announced that it was terminating all clinical use of GDNF.  The two safety concerns that Amgen cited included: (1) the results of a primate study wherein four out of forty-four primates that were given GDFN suffered cerebellar toxicity and (2) the discovery that several human subjects had developed neutralizing antibodies.  The defendant also stated that the reason for terminating the study was the aforementioned lack of efficacy.  The defendant asserted that any positive effects were caused from the placebo effect common in clinical trials for Parkinson's disease.

The plaintiffs assert that Amgen terminated the study for purely economical reasons because Amgen's patent would soon expire, the drug had a short shelf life, and the drug was extremely costly due to the complicated delivery method.  The plaintiffs submitted the affidavit of Dr. Michael Hutchinson ("Dr. Hutchinson"), one of the principal investigators of the New York site, who testified that the primates received larger doses than the human subjects and, as a result, suffered damage due to the rapid withdrawal of GDNF.  Dr. Hutchinson disagreed with the placebo effect theory of the defendant and testified that the drug worked for its intended purpose.  Dr. Hutchinson also disagreed with the defendant that the development of antibodies caused any harm to the patients and testified that the development of cerebellar lesions was not caused by GDNF.

Amgen fiercely contests the plaintiffs' contention that the

decision to halt the study was financially motivated.   Amgen
submitted evidence that the patent on GDNF does not expire until
2017.   Further, Amgen submitted evidence that it would be in the
company's best financial interest for GDNF to quickly reach the
market because the company had already spent millions in purchasing
Synergyn and researching the drug.

Concerned with ending the study, several principal
investigators and Amgen met with the FDA to seek approval for
"compassionate use" of GDNF for the test subjects.   Compassionate
use is continued use of a drug even though the drug is proven to be
unsafe.   The FDA held that it would approve compassionate use of
GDNF but left the decision up to Amgen.

After seeking the advice of eight external experts, seven of
whom advised Amgen to terminate the clinical trials, Amgen made the
decision to terminate the trials.   The plaintiffs subsequently
filed a complaint against Amgen asserting claims for: 1) promissory
estoppel; 2) breach of fiduciary duty; 3) breach of contract; 4)
breach of duty of good faith and fair dealing; 5) violation of
Kentucky unfair trade practices; and 6) negligence.   The plaintiffs
seek monetary damages and permanent injunctive relief.   The
plaintiffs contemporaneously filed a motion for a preliminary
injunction, addressing only the likelihood of success on the merits
of their claims for breach of contract, promissory estoppel, and
breach of fiduciary duty.   The plaintiffs allege that as soon as

7

they stopped taking GDNF, their conditions worsened and all the benefits of the drug ceased.

## II. New York Decision in a Related Case

Two patients that participated in the New York clinical trial of GDNF filed a complaint in the Southern District of New York, asserting nearly identical state claims, including: 1) breach of contract; 2) promissory estoppel; 3) breach of fiduciary duty; 4) breach of good faith and fair dealing; 5) violation of New York Business Law; and 6) negligence. *Suthers, et al. v. Amgen, Inc.*, No. 05-CV-4158 (PKC) (S.D.N.Y. June 6, 2005) (slip op'n). The New York plaintiffs, Robert Suthers and Niwana Martin, also filed a motion for a preliminary injunction based on their claims for promissory estoppel, breach of contract, and breach of fiduciary duty. Judge P. Kevin Castel, United States District Judge for the Southern District of New York, denied the plaintiffs' motion, holding that the plaintiffs had no likelihood of success on *any* of the asserted claims.[4]

As to the breach of contract claims, the court held that the plaintiffs were unlikely to succeed on the merits because they failed to submit direct evidence of any oral or written communications between the plaintiffs and Amgen. The court held that while the NY Informed Consent defined the rights of the

---

[4] The court did not reach the good faith, New York Business law or negligence claims because the plaintiffs did not argue likelihood of success on these claims.

plaintiffs as against New York University Hospital ("NYU"), the document was not a contract between Amgen and the plaintiffs.

The court also found the plaintiffs' arguments concerning the authority of the principal investigators to bind Amgen unlikely to succeed on the merits because the New York Clinical Trial Agreement, between NYU and Amgen, clearly stated that the principal investigators and NYU were independent contractors that did not have the authority to bind Amgen. Additionally, the court found that the plaintiffs failed to present evidence of apparent authority because there was no evidence in the record of "words or conduct on the part of Amgen that would reasonably give rise to an appearance and belief that Dr. Hutchinson acted as Amgen's agent." *Id.* at 14.

The court also held that the plaintiffs would not likely succeed on the promissory estoppel claims because the plaintiffs did not submit any clear evidence of a promise by *Amgen* to treat the plaintiffs indefinitely. The court found that the NY Informed Consent was clear that Amgen could terminate the study at any time and that there was no other evidence of a promise by Amgen.

Finally, the court found that the breach of fiduciary duty claims did not have a likelihood of success on the merits because Amgen, as the study sponsor, did not have a fiduciary duty to any of the study participants. After distinguishing *Grimes v. Kennedy*

*Krieger Institute, Inc.*, 782 A.2d 807 (Md. Ct. App. 2001),[5] and relying upon *Moore v. Regents of University of California*, 51 Cal. 3d 120 (Cal. 1990),[6] the court found that under the facts of the case, clinical trial sponsors do not have a fiduciary duty to continue treatments to subject participants.  The court noted that if it held that there was a fiduciary duty between sponsor and participant, various questions would have to be answered, such as: how would the duty be defined; how long would the duty last; and would the duty survive the decision of the patient to cease his or her relationship with the research institution?

The court found that Amgen purposely structured the clinical trial to foster independence and objectivity and, as a result, it did not select, meet, or know any details of the participants' medical history.  Although there were constraints on Amgen's

---

[5] In *Grimes,* the Maryland Supreme Court found that medical researchers owed a duty sounding in tort to children whose parents had been induced to live in homes containing lead paint so that the paint's effects could be measured against a control population without such exposure.  782 A.2d at 85-52.  The researchers in *Grimes* designed the study, recruited the subjects, and obtained their consent.  The *Grimes* court didn't characterize the duty, but held that there was a duty to the research subject that was independent of the consent form.  *Id.*  The *Suthers* court distinguished *Grimes* because Amgen employed independent researchers, while in *Grimes*, the sponsor was also the researcher. *Suthers*, No. 05 Civ. 4158 (PKC) at 17-18.

[6] In *Moore*, the California Supreme Court held that treating physicians had a fiduciary duty to their patients but that researchers did not have a fiduciary duty.  The court found that the only theory of liability for the researchers would have to be respondeat superior and that the plaintiffs had not presented sufficient evidence of this theory.  51 Cal. 3d at 133-34.

conduct, including FDA regulations, the contractual commitments it undertook in the NY Clinical Trial Agreement, and ethical constraints imposed internally and through the marketplace, the court found that were no fiduciary duties between Amgen and the study participants.

### III. Standard of Review

To determine whether a preliminary injunction should be granted, the Court considers the following factors:

> (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). The factors are not prerequisites to entry of a preliminary injunction but instead should be balanced against each other. *Id.*; *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). The party seeking a preliminary injunction has the burden of persuasion to show that the factors weigh in favor of the Court granting the motion. *Leary*, 228 F.3d at 739.

Further, the degree of likelihood of success depends on the strength of the other three factors. Thus, an injunction would be proper "where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and

irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Unsecured Creditors' Comm. of DeLorean Motor Co. v. DeLorean* (*In re DeLorean Motor Co.*), 755 F.2d 1223, 1229 (6th Cir. 1985). Even though a finding of no likelihood of success "is usually fatal[,]" *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000), the most prudent course of analysis is for the Court to analyze the strength of each factor. *Leary*, 228 F.3d at 739 n.3 (noting that for ease of appellate review "it is generally useful for the district court to analyze all four of the preliminary injunction factors").

### IV. Factual Findings and Conclusions of Law

**A. Likelihood of Success on the Merits**

For the reasons stated below, the Court finds that the plaintiffs have failed to show a strong[7] likelihood of success on the merits of their breach of contract, promissory estoppel, and fiduciary duty claims.

**1. Breach of Contract**

Pursuant to Kentucky law, "in order to recover in any action based on breach of a contract, a plaintiff must show the existence and the breach of a contractually imposed duty." *Lenning v.*

---

[7] As discussed in sections IV (B) & (C), the Court finds that the plaintiffs' evidence of irreparable harm does not decidedly outweigh the defendant's potential harm. As a result, the plaintiffs' likelihood of success must be "strong" in order to prevail. *In re DeLorean Motor Co.*, 755 F.2d at 1229.

12

*Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).
Thus, the plaintiffs "must show that an actual agreement existed
between the parties with clear and convincing evidence."  *Auto
Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 790
(W.D. Ky. 2001).

    The plaintiffs argue that the defendant breached a contract to
provide the plaintiffs with GDNF.  The contract, the plaintiffs
assert, is manifested by the KY Informed Consent Document and the
representations of the principal investigators of the Kentucky
study.  Both contentions are without merit.

    First, the plaintiffs have failed to show that the KY Informed
Consent document is a contract binding on Amgen.  In the motion and
in the hearing, the plaintiffs admitted that Amgen did not sign the
KY Informed Consent document.  The plaintiffs can not refute that
"it is axiomatic that courts cannot bind a non-party to a contract,
because that party never agreed to the terms set forth therein."
*See EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 460 (6th
Cir. 1999).

    None of the other documents in this matter establish a
contract between Amgen and the plaintiffs.  For instance, Amgen was
bound by the Clinical Trial Agreement ("the Agreement") that was
signed by Amgen, the University of Kentucky, and the doctors
participating in the study.  The Agreement states that it may be
terminated "by Amgen immediately upon written notice."  (Def.'s

13

Mem. in Opp'n, Ex. 25 at 7.)  Upon written notice of termination, "the Principal Investigators shall stop enrolling Subjects into the Study and shall cease conducting procedures on Subjects already enrolled in the Protocol as directed by Amgen, to the extent medically permissible and appropriate." (*Id.*)  The Agreement also states that the "Principal Investigators shall carry out the Study in a professional, competent manner in accordance with the Protocol, the terms of this Agreement and any applicable Institution policies." (*Id.* at 1.)  It also provides that "[t]his Agreement, together with Schedule A attached hereto, represents the entire understanding of the parties with respect to the subject matter hereof." (*Id.* at 8.)  The Protocol similarly provides that "Amgen and the investigators reserve the right to terminate the study, according to the study contract." (*Id.*, Ex. 27 at 29.)

Pursuant to the Agreement, Amgen provided written notice to the principal investigators that it was terminating all clinical use of GDNF, thus fulfilling its responsibility under the Agreement and the Protocol, the only documents this Court finds to be binding on Amgen. (*Id.*, Ex. 32.)

Second, the plaintiffs have failed to show that representations of the principal investigators in the Kentucky study in any way bound the defendant.  Under Kentucky law, whether Amgen employed the physicians affiliated with the study as independent contractors or agents is determined by looking at the

14

following factors:

> a.   The extent of control which, by the agreement, the master may exercise over the details of the work;
>
> b.   Whether or not the one employed is engaged in a distinct occupation or business;
>
> c.   The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> d.   The skill required in the particular occupation;
>
> e.   Whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the job;
>
> f.   Whether or not the work is a part of the regular business of the employer; and
>
> g.   Whether or not the parties believe they are creating the relationship of master and servant.

*Johnston v. Sisters of Charity*, No. 2002-CA-001812, 2003 WL 22681562, at *2 (Ky. Ct. App. Nov. 14, 2004) (unpub.); *CSX Transp., Inc. v. First Nat'l Bank*, 14 S.W.3d 563, 566 (Ky. Ct. App. 1999) (stating that control is the most important factor).

Analyzing these factors, the Court finds that Amgen does not have a strong likelihood of success on the merits in proving that the principal investigators had authority to bind Amgen.  The Agreement provides that the "Institution agrees to act as an independent contractor without the capacity to legally bind Amgen and also agrees that it is not acting as an agent or employee of Amgen."  (The Agreement, Def.'s Ex. 25 at 8.)  Because the Kentucky doctors were employees of the University of Kentucky, they too were independent contractors lacking the power to bind Amgen.  *Berry v.*

15

*Delta Airlines, Inc.*, 260 F.3d 803, 812 (7th Cir. 2001) (noting that "an employee of an independent contractor typically cannot be considered an agent of the employer").

Analyzing the remaining factors also leads to the conclusion that the Kentucky doctors were independent contractors.  The Kentucky study was designed and implemented by the principal investigators.  Amgen became a sponsor in 2002, after the Protocol was submitted to the Institutional Review Board and after the patients were selected for the study.  The study took place at the University of Kentucky, not at Amgen's place of business.  Amgen structured the sponsorship so that the company would be independent of the study, thus exerting no control over the principal investigators.  Finally, the doctors were highly specialized, having an extensive amount of experience in their field.

The plaintiffs are also similarly unlikely to succeed in asserting that the principal investigators had apparent authority to bind Amgen.  In Kentucky, apparent authority may be conferred on an independent contractor; however, apparent authority is "the authority the agent is held out by the principal as possessing.  It is a matter of appearances on which third parties come to rely." *Mill St. Church of Christ v. Hogan*, 785 S.W.2d 263, 267 (Ky. Ct. App. 1990); *accord Estell v. Barrickman*, 571 S.W.2d 650, 652 (Ky. Ct. App. 1978).  The plaintiffs failed to submit evidence that Amgen made *any* representations to the plaintiffs to make the

16

plaintiffs think that Amgen, the sponsor of the study, was bound by the actions of the principal investigators.  In fact, the plaintiffs' motion states, "By Amgen's own design, none of its scientists or physicians had any contact with plaintiffs and plaintiffs had no reason to believe Amgen representatives were the ones who could make medical decisions regarding their continued care." (Pl.'s Mem. in Supp. at 20.)  Thus, having found that a contract was not created between Amgen and the plaintiffs based on the language of the operative documents and the representations of the Kentucky doctors, the Court finds there is not a strong likelihood of success on the plaintiffs' breach of contract claims.

Even if the Court had found that the KY Informed Consent created a binding contract between Amgen and the plaintiffs, the Court finds that the language of the document supports Amgen's ability to terminate the study for scientific reasons.  For instance, the document provides, "The individuals conducting the study may need to withdraw you from the study.  This may occur if they find that your being in the study is more risk than benefit to you, if you are not able to follow the directions they give you, or *if the agency funding the study* decides to stop the study early for a variety of scientific reasons" (Pl.'s Compl., Ex. E at 15) (emphasis added.)  The plaintiffs contend that Amgen is not the "agency funding the study" because it is defined as the "sponsor" of the study in the document.  Further, the plaintiffs argue that

17

the document should not be read to construe Amgen as an agency because that term is used for governmental agencies.

The Court finds the language of the document is clear that Amgen is the agency funding the study.  For instance, the document provides that "[t]he results of this study will be shared with any agencies that provide materials or financial support for the study, including Amgen and Medtronic, and other federal agencies, if required."  (*Id.* at 2.)  Also, the defendant submitted evidence of Amgen's financial contribution to the study, further supporting this finding.  (Def.'s Mem. in Opp'n, Schedule A, Ex. 26, filed under seal.)

Plaintiffs hang their hat on the following paragraph in the document: "Starting at week 28 you may elect to continue treatment for up to an additional 24 months.  If you elect to continue treatment the procedures listed for week 33 will be done approximately 1 month after the conclusion of the extended treatment period."[8]  (Pl.'s Compl., Ex. E at 2.)  This statement, however, should be read in the context of the entire contract, which provides that Amgen may terminate the study for a variety of

---

[8] The plaintiffs distinguish this case from *Suthers* because the NY Informed Consent did not contain the statement quoted above and because the NY Informed Consent document clearly indicated that Amgen had a right to terminate the study.  As noted, the Court does not find that Amgen is bound by the KY Informed Consent document, but even if Amgen was bound, the language of the document supports a finding that Amgen could terminate the study for various scientific reasons.

scientific reasons.  Although the plaintiffs submitted scientific evidence rebutting Amgen's scientific reasons for terminating the study, the defendant submitted credible, scientific evidence supporting their reasons for termination.  Therefore, the Court finds that Amgen had sufficient scientific reasons to terminate the study based on (1) the demonstrated lack of efficacy in the Phase II study[9] - a study that was more reliable than the Kentucky study, and (2) the safety concerns.[10]  The discovery of antibodies in

---

[9] For instance, the defendant produced declarations from the following principal investigators that support Amgen's decision to terminate the trial: Drs. G. Frederick Wooten, Principal Investigator of the New York Hospital study; John Nutt, Principal Investigator of the Oregon Health Sciences University; Anthony E. Lang and Amfres M. Lozano, Principal Investigators of the Toronto site; and Mark A. Stacy, Principal Investigator of the Duke site. (*See* Def.'s Mem. in Opp'n, Exs.  11, 12, 13, 16 & 14, respectively.)

[10] As to the concern over the discovery of antibodies, the defendant introduced the affidavit of Dr. Roger M. Perlmutter, Executive Vice President of Research and Development at Amgen, that attests to the discovery of antibodies in study participants and the possible harmful effects.  (Def.'s Mem. in Opp'n, Perlmutter Aff., Ex. 1 at ¶¶ 48-65.)  The defendant also introduced the declaration of Steven J. Swanson, Ph.D, Director of the Clinical Immunology Department at Amgen, that describes the serious effects of antibodies in mice as including "renal agenesis (absence of one or both kidneys) or severe dysgenesis (ambiguous genitals) and causes the complete lack of an enteric nervous system and sensory neurons."  Dr. Swanson stated that while the effects of antibodies from GDNF are unknown, there is a potential for the antibodies to attack the endogenous or naturally occurring GDNF in the body, causing similar serious consequences. (*Id.*, Swanson Decl., Ex. 6, at ¶¶ 9-10.)

As to the safety concern over the toxicology findings of the primate study, the defendant introduced affidavits or declarations of Drs. Perlmutter; Sean Harper, Vice President of Medical Science Development at Amgen; Mark T. Butt, D.V.M., General Manager of

19

several patients and the possibility of cerebellar lesions in primates given GDNF provided Amgen with sufficient scientific reasons to terminate the study.   As Amgen points out, the FDA commented that if the safety concerns were known earlier, it would not have approved the study.  (Def.'s Mem. in Supp., Harper Aff., Ex. 5 at ¶ 51) (stating that "[t]he FDA indicated that Amgen's decision seemed appropriate, science-based and rational.  In fact, in subsequent discussions, the FDA suggested that had the toxicology results been available before the human studies were initiated, it may not have approved the human studies.")

**2. Promissory Estoppel**

The plaintiffs assert promissory estoppel claims based on representations of the principal investigators of the Kentucky study, Drs. Slevin and Young, and the other physicians involved in the study, Drs. Gash and Gerhardt (Ph.Ds).  The plaintiffs state that the doctors made representations that if the plaintiffs participated in the trials, the doctors would make decisions in the plaintiffs' best therapeutic interest and that if they concluded that GDNF was safe and effective, the plaintiffs would continue to receive the drug indefinitely or at for least the remainder of the

---

Charles River Laboratories, Inc.; Robert B. Boyd, D.V.M., Vice President and Director of Northern Biomedical Research, Inc.; and Joy A. Cavagnaro, P.h.D., President of Access BIO, all of which attest to the brain lesions discovered in the primate trial and the possible serious consequences for human subjects.  (*Id.*, Exs. 1, 5, 2, 3 & 4, respectively.)

election period.  The plaintiffs argue that this promise is manifested in the KY Informed Consent, with the language quoted previously concerning the additional twenty-four weeks of treatment and the statement that the treatment would only be terminated upon three conditions, one of which was that the agency funding the study could terminate it for scientific reasons.

Kentucky has adopted the Restatement (Second) of Contracts § 90 (1965), which provides:

> A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Id.; Floyd v. Christian Church Widows & Orphans Home*, 176 S.W.2d 125, 130-31 (Ky. 1943); *McCarthy v. Louisville Cartage Co.*, 796 S.W.2d 10, 11 (Ky. Ct. App. 1990); *FS Invs., Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491, 506-507 (E.D. Ky. 2002) (analyzing Kentucky law); *Bergman v. Baptist Healthcare Sys., Inc.*, 344 F. Supp. 2d 998, 1003 (W.D. Ky. 2004) (analyzing Kentucky law).

The Court finds that the plaintiffs have not shown a strong likelihood of success on the merits of the promissory estoppel claims because the plaintiffs have not submitted any evidence of a clear promise by *Amgen*.  As stated above, the plaintiffs failed to prove that the principal investigators could bind Amgen and the KY Informed Consent document contains no clear promise that Amgen

21

would provide indefinite treatment.   The statement that the plaintiffs may continue treatment for an additional twenty-four weeks is not a promise of extended treatment beyond the study; instead, the additional treatment is also subject to Amgen's ability to terminate the study for a variety of scientific reasons. Reasons that were, as noted above, sufficiently sound and supported by scientific evidence.

### 3. Breach of Fiduciary Duty

The plaintiffs allege that the defendant, working through the physicians involved in the study, breached its fiduciary duty to the plaintiffs to "ameliorate pain and to treat the sick with the best medicine available." (Pls.' Mem. in Supp. at 24.)  Further, the plaintiffs assert that the defendant, working through the physicians, has a moral and ethical duty to not allow a patient to suffer unnecessary pain.

Pursuant to Kentucky law, the plaintiffs have to establish that a fiduciary relationship was created between *Amgen* and the plaintiffs.  Although there is no one formula for determining whether a fiduciary relationship exists, the Kentucky Supreme Court held, "[A]s a general rule, we can conclude that such a relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters

22

connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991); *accord St. Martin v. KFC Corp.*, 935 F. Supp. 898, 907 (W.D. Ky. 1996) (analyzing Kentucky law).

The plaintiffs cite *Grimes*, 782 A.2d at 807, in support of their argument that a fiduciary relationship exists. In *Grimes,* the defendant research institute designed a study wherein children living in rental homes containing lead paint would be tested for lead levels in their blood. The rental homes used varying degrees of lead abatement procedures in order to find the best procedure to decrease lead in homes. The researchers were also the sponsors of the study and in privity with the study participants.

The Maryland Court of Appeals found that the consent agreement signed by the plaintiffs did not absolve the negligence of the researchers in placing the children in harm through the study. The court found that the researchers owed a duty to the subjects not to place them in unreasonable harm and to promptly inform them of potential hazards. *Id.* at 851. The court noted that special relationships normally are created that give rise to a duty of care for negligence on the part of researchers toward human subjects through research projects. *Id.* at 858. The court also noted that governmental regulations may create duties of researchers toward human subjects. *Id.*

The court in *Suthers* distinguished *Grimes* and held that a

fiduciary relationship did not exist between Amgen and the research subjects because Amgen did not take an active role in the study. Further, the New York court found that Amgen purposely distanced itself from the study, so as to retain the independent nature of the clinical trial.

This Court finds the reasoning of *Suthers*, albeit clearly not binding, certainly instructive. No court has found that a fiduciary relationship is created by a sponsor of a clinical trial and the subjects. The *Grimes* court held that a duty could be found for *researchers* in a negligence action. *Grimes* can not be read to hold that a fiduciary duty would be created in a situation such as this, wherein the sponsor maintained an independent status throughout the clinical trial.[11]

**B. Irreparable Harm to Plaintiffs**

The plaintiffs argue that absent an injunction, they would suffer immediate, irreparable harm because they suffer from a

---

[11] The plaintiffs also assert that a fiduciary relationship is created by the Common Rule, the federal regulations that regulate all clinical trials with research subjects. *See* 45 C.F.R. part 46, pub. at 56 F.R. 28,012 (June 18, 1991). The plaintiffs note that the Common Rule was established consistent with the Belmont Report, the Report of the National Commission for the Protection of Research Subjects in Biomedical and Behavioral Research. The Belmont Report sets forth three principles that guide human clinical trials: 1) respect for persons; 2) beneficence; 3) justice. The plaintiffs argue that by withdrawing use of the drug GDNF, the defendants are acting inconsistently with the Belmont Report and, thus, are breaching their fiduciary duties to the plaintiffs. The Court finds this argument unpersuasive. While federal regulations create certain duties on sponsors of drug trials, a fiduciary duty is not one of them.

debilitating disease where every day, the production of dopamine diminishes and they have less control over their bodies. In support, the plaintiffs submitted affidavits of the physicians conducting the Kentucky study and other physicians who have testified that GDNF is safe and effective and should be provided to the plaintiffs to decrease the degenerative process. The plaintiffs argue that GDNF is the only drug on the market that will decrease the death of dopamine cells.

The defendant counters that not only is the plaintiffs' alleged harm not imminent, but it is also inherently speculative because there is evidence in the record that GDNF is neither efficacious nor safe. The defendant introduced contrary evidence that GDNF is not efficacious and is in fact potentially dangerous. For instance, the defendant produced affidavits of several principal investigators who testify that the results of the clinical trial prove that GDNF is not efficacious. The defendant also submitted evidence of safety concerns, including evidence that neutralizing antibodies were found in three patients in the '168 study, one patient from the Kentucky study, and a total of 10% of the Phase II study developed antibodies, potentially causing drastic results. Amgen also submitted evidence that cerebellar brain lesions were found in four out of forty-four primates following a toxicity study, also potentially causing irreversible brain damage in human subjects.

The Court finds that the plaintiffs have failed to meet their burden in proving that they would suffer immediate, irreparable harm if an injunction is not granted.  While the plaintiffs introduced evidence that GDNF may be safe and effective, the defendant also introduced equally sound, scientific evidence to the contrary.  As such, it is unclear whether the plaintiffs would benefit from continued treatment, much less be irreparably harmed in the event an injunction does not issue.  *See, e.g., Glauser-Nagy v. Med. Mut.*, 987 F. Supp. 1002, 1016 (N.D. Ohio 1997) (holding that the plaintiff failed to show irreparable harm from denial of experimental cancer treatment by her provider where there were no reliable, Phase III studies to verify this conclusion); *accord Graham v. Med. Mut.*, 130 F.3d 293, 296 (7th Cir. 1997).

**C. Harm to Defendant**

The plaintiffs argue that the defendant will not suffer any harm if the injunction is granted because the plaintiffs already have the pumps necessary to take GDNF and agree to accept all the risks of the drug's alleged harmful effects.  Further, the plaintiffs assert that Amgen admitted in the New York case that providing GDNF would not be burdensome.

The defendants, on the other hand, argue that the company would be substantially harmed by an injunction due to "the possibility of future civil liability."  The defendant states that an inunction "would also subvert the company's ethical principles

under which it operates, divert company resources from other therapeutics development, and undermine the scientific integrity of the resulting research." (Def.'s Mem. in Opp. at 34.)

While Plaintiffs state that they are willing to take all the adverse risks of GDNF, as the defendant points out - the plaintiffs can not waive liability for future claims of their spouses and children. Thus, in the face of credible scientific evidence of possible adverse effects, the Court finds that the defendant might well suffer irreparable harm if an injunction was entered because of the possibility of future liability. Moreover, if an injunction was entered, it would seriously undermine the authority of the defendant, as a sponsor, to fulfill its duties pursuant to the Food, Drug and Cosmetic Act ("FDCA") to terminate a trial when a drug is found to have "an unreasonable and significant risk" to patients. 21 C.F.R. § 312.56(d). Nevertheless, on balance, the Court would side with the plaintiffs on this prong.

**D. Public Policy**

The plaintiffs argue that public interest would be furthered by entry of an injunction because *physicians* should decide whether life-saving treatment should be given to the patients and not pharmaceutical companies. Additionally, the plaintiffs contend that ignoring the patients' view points throughout the trial process and causing them unnecessary suffering disrespects human subjects and deters the public from volunteering to participate in

27

clinical trials.   In support, the plaintiffs submitted the affidavit of the Executive Director of the Parkinson's Pipeline Project, Dr. Cohen, who testifies that the Project "unanimously supports the [plaintiffs'] request for reinstatement of their GDNF treatments ... By halting the GDNF trials, Amgen is denying the Parkinson's community potentially valuable information on GDNF therapy." (Pl.'s Compl., Ex. U.)

The defendant, on the other hand, asserts that the public interest weighs against granting an injunction because forcing pharmaceutical companies to provide investigational drugs like GDNF is contrary to the regulatory scheme of FDA enforcement.   Amgen argues that while individual patients and physicians may believe that a certain experimental drug is safe and effective, it is up to the FDA to determine safety and efficacy.   The Court agrees.

Although the Court personally understands the devastation Parkinson's disease brings to the lives of those who have the disease (my late father suffered from it) and the plaintiffs' immense desire for a cure, the public interest would not be furthered by ordering a clinical trial sponsor to provide unapproved and potentially dangerous drugs to clinical trial participants.   The public interest, manifested by the enactment of the FDCA, is in protecting the public from potentially harmful drugs, as evidenced by the system of regulating drugs prior to their release in the market.   *United States v. Rutherford*, 442 U.S.

28

544, 559 (1979) (holding that "the [FDCA] makes explicit provision for carefully regulated use of certain drugs not yet demonstrated safe and effective"); *Gonzales v. Raich*, --- U.S. ---, 125 S. Ct. 2195, 2212 (2005) (stating that "the dispensing of new drugs, even when doctors approve their use, must await federal approval").

While the plaintiffs assert that denying an injunction would discourage patients from participating in clinical trials, the reverse is also true of discouraging clinical trial sponsors from financially supporting clinical trials. Granting an injunction and forcing a trial sponsor to provide drugs it – and the FDA – find unsafe, because other experts find the drugs safe and effective, would discourage sponsors from financially supporting human clinical trials. This is true because sponsors would have to continue to make and provide drugs that are potentially dangerous. *See also Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 630 (1973) (discussing efficacy requirements under the FDCA and noting that the beliefs of individual physicians and experts do not replace rigorous scientific evaluation for safety and efficacy). Thus, because the public's safety and the future of clinical trial research weigh in favor of denying the injunction, the Court finds that the public interest would not be furthered by entry of an injunction.

### V. Conclusion

Based on the foregoing, the Court finds that three of the four

factors weigh in favor of denying a preliminary injunction.  Those three factors heavily outweigh the slight potential harm to the defendant should an injunction be entered.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for preliminary injunction [Record No. 2] be, and the same hereby is, **DENIED**.

This the 8th day of July, 2005.



Signed By:

*Joseph M. Hood*

United States District Judge

30